IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Connie M. Parr

      Plaintiff,                       No. CIV S-04-1508 CMK

    vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

      Defendant.                  <u>ORDER</u>

_____/

        Plaintiff, Connie M. Parr, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying her application for Supplemental Security Income (SSI) under the provisions of Title XVI of the Social Security Act. The parties have filed cross motions for summary judgment. As both parties have consented to magistrate jurisdiction, the motions are before the undersigned for decision. For the reasons reflected below, plaintiff's motion is DENIED and the Commissioner's motion is GRANTED.

///

///

///

## I. BACKGROUND

Plaintiff filed an application for SSI, alleging an inability to work since 1999 due to knee pain, which limited her ability to stand and walk, and to a bipolar disorder. Plaintiff's application was denied initially and upon reconsideration. A hearing was held before an administrative law judge on August 22, 2003.[1]

At the hearing before the ALJ, plaintiff testified that she was forty-one years old and had an eleventh grade education. (Tr. at 41, 43.) Plaintiff testified that she had no relevant work experience, as she had never worked. (Tr. at 43.) Plaintiff stated that she had previously been supported by her boyfriends. (Tr. at 44.) She currently supports herself with general assistance (GA). (Tr. at 47.) Plaintiff stated that she lives in a motor home, which is parked on a relative's family member's property, with her boyfriend. (Tr. at 44.) Plaintiff stated that she has electricity and running water but must use a "hot water hose" outside to shower. (Tr. at 42.)

Plaintiff's daily activities include changing the sheets on her bed, which she is unable to accomplish without help from her boyfriend. (Tr. at 45.) Plaintiff does laundry at the laundromat every two weeks. (Id.) Plaintiff does not sweep or vacuum the carpet in her motor home. (Tr. at 46.) Plaintiff is unable to scrub the bathroom as she has problems bending down. (Id.) Plaintiff stated that she cooks one meal a day, and otherwise eats sandwiches. (Id.) She grocery shops twice a month and spends about an hour in the store each visit. (Id.) During visits to the grocery store, plaintiff usually rides a motorized shopping card. (Id.)

///

///

---

[1] A hearing before an ALJ was scheduled for October 7, 2002, but plaintiff did not appear. A Notice to Show Cause for Failure to Appear was issued. Plaintiff did not respond. Subsequently, a dismissal was issued on October 25, 2002. Claimant filed a request for review with the Appeals Council, and filed a second application for SSI benefits on November 25, 2002. The Appeals Council remanded the case in order for an ALJ to determine if plaintiff had good cause not to appear. The ALJ, finding that plaintiff had good cause not to appear, consolidated plaintiff's two applications for SSI and provided plaintiff with a hearing on August 22, 2003.

1         Plaintiff's hobbies include fishing and camping.  Plaintiff has gone fishing once
2  or twice in the past two years.  (Tr. at 47.)  At the same time she went fishing, she also went
3  camping.  (Id.)  For exercise, plaintiff walks around the "back orchard area." (Tr. at 48.)  She
4  can walk for five or six minutes at a time.  (Id.)  Plaintiff sometimes does crossword puzzles and
5  enjoys watching television and spending time with her dog.  (Tr. at 59.)
6         Plaintiff testified that she has a history of drug and alcohol use.  (Tr. at 49.)
7  Plaintiff stated that she presently did not use street drugs, but in the past, she has used
8  methamphetamine, marijuana and cocaine.  (Id.)  The last time plaintiff used cocaine was four
9  or five years ago.  (Id.)  She stated that her last marijuana use was six years prior.  (Id.)  Plaintiff
10 used methamphetamine once in the last four years, however that use was three months prior to
11 her administrative hearing.  (Id.)  Plaintiff testified that she drinks about a six-pack of beer a
12 week. (Tr. at 50.)  Plaintiff stated that, before moving to Shasta County in 2001, she drank much
13 more than a six-pack a week; she had beer or hard alcohol every day.  (Tr. 50-51.)
14        Plaintiff related that she had several medical problems which kept her from
15 working.  (Tr. at 52.)  Plaintiff's most serious problem is her knees.  (Tr. at 53.)  Plaintiff stated
16 that both knees bothered her, but her left knee was worse; it cracks and pops and "gives out on
17 her" when she is walking.  (Tr. at 53.)  Plaintiff stated that her knee pain makes her fall down,
18 keeps her from bending down and limits her standing and sitting.  (Tr. at 54-55.)  Plaintiff stated
19 that her sitting is limited because her knees start to stiffen up.  (Tr. at 55.)  Plaintiff stated that
20 her knee problems are her only physical problem which preclude her from working.  (Id.)
21 Plaintiff's knee problems do not stem from an injury but instead from rheumatoid arthritis.  (Tr.
22 at 53.)  When the ALJ pointed out that rheumatoid arthritis affects all joints, plaintiff stated that
23 the arthritis is starting to affect her shoulder and all of her joints.  (Id.)  Plaintiff takes Naprosyn
24 for her knees, but she states that it is not working.  (Tr. at 48.)
25        Plaintiff stated that her emotional problems also prevent her from working.  (Id.)
26 Plaintiff was diagnosed with bipolar disorder in June of 2003, while in the hospital after a near

drowning. (Tr. at 55-56.)  Plaintiff's symptoms include hearing voices, nervousness and breaking out in sweats and rashes.  (Tr. at 58.)  Plaintiff hears voices at night, when it is dark.  (Tr. at 60.) Plaintiff takes Depakote for her bipolar disorder. (Tr. at 48.)  Plaintiff also testified that she has trouble sleeping and that her appetite is "getting better."  (Tr. at 59.)  Plaintiff takes Trazodone for her problems sleeping.  (Tr. at 48.)

The medical evidence in this case reflects the following.[2]  On January 4, 2000, Plaintiff was seen in the emergency room (ER) for knee pain and cracking and popping in her knees. (Tr. at 150.)  Plaintiff related that her left knee hurt more than her right knee, that her knees were mildly swollen and that there is a worsening pain when she gets up or puts weight on her knees. (Id.)  Plaintiff had a workup done in the ER, which revealed a normal x-ray of the left knee. (Id.)  Plaintiff was given Toradol 50mg, which relieved her pain. (Id.)  The ER records note that plaintiff has a serious alcohol problem and that she was offered detox, but refused. (Id.)  On February 16, 2000, plaintiff was seen in the ER for knee pain.  (Tr. at 215.)  On examination, there were findings of only mild effusion and crepitus (crackling sound).  (Id.) Plaintiff was diagnosed with bilateral knee arthritis.  (Id.)

Plaintiff was examined by Charles R. Miller, M.D., a consultative orthopedic surgeon, on June 30, 2001. (Tr. at 189-198.)  During the evaluation, plaintiff stood and walked independently but with a limp.  (Tr. at 191.)  Range of motion testing was normal throughout her cervical and lumbar spine areas and in her upper and lower extremities.  (Tr. at 191-94.) Plaintiff was diagnosed with patellofemoral arthritis of the bilateral knees with slight effusion, increased heat and limited motion.  (Tr. at 195.)  Dr. Miller opined that plaintiff could lift and carry twenty pounds occasionally and frequently; stand and walk six hours per day on a non-

---

[2]From June 27, 1999 to July 2, 1999, plaintiff was hospitalized due to uterine fibroids with uncontrolled bleeding, and she was diagnosed at that time with alcohol and methamphetamine abuse.  (Tr. at 17, 179-185, 253-254.)  On September 24, 1999, plaintiff underwent a hysterectomy. (Tr. at 17, 159-160.)  The ALJ noted that after plaintiff's hysterectomy, the medical record documented no further evidence of symptoms from this disorder or any other functional limitations.

4

1    continuous basis; but she could not sit for prolonged periods of time; and she was severely
2    restricted from squatting or kneeling. (Id.) Dr. Miller ordered an x-ray of plaintiff's bilateral
3    knees, which showed evidence of moderate degenerative changes, slightly more marked on the
4    left knee than on the right. (Tr. at 198.)
5           On July 19, 2001, a State Agency physician reviewed the record and opined that
6    plaintiff retained a capacity to occasionally lift or carry twenty pounds; frequently lift or carry
7    ten pounds; stand or walk and sit about six hours in an eight hour work day; and had unlimited
8    ability to push and pull in her upper and lower extremities. (Tr. at 200.) The physician also
9    opined that plaintiff was able to frequently climb, balance, stoop and occasionally kneel, crouch
10   and crawl. (Tr. at 201.) Plaintiff was assessed as having no manipulative, postural,
11   communicative or environmental restrictions. (Tr. at 202-203.) In August 2001, a second set of
12   x-rays showed only mild degenerative changes and mild narrowing of the medial joint
13   compartment of the left knee. (Tr. at 209, 304.)
14          In August 2001, a physician from the Shasta County Community Health Center
15   completed a General Assistance Medical Report, which is a form report that the doctor fills out
16   by checking either the "yes" or the "no" box. (Tr. at 288.) On plaintiff's form, the physician
17   checked "no" next to the following boxes: that plaintiff was "capable of walking 2 miles over 4
18   hours; that plaintiff was "capable of job search activities 24 hours per week;" that plaintiff is
19   "physically capable of performing primary job;" that plaintiff was "mentally capable of
20   performing primary job" and; that plaintiff is "capable of performing job tasks at least 24
21   hours/week." (Id.) The physician checked "yes" next to the box beside "patient is socially
22   appropriate for primary job." (Id.) On September 6, 2001, plaintiff was examined by R.
23   Stanfield, M.D. a physician at Shasta County Community Health Center. (Tr. at 289.)
24   Examination findings included mild chronic changes in both knees, mild muscle atrophy on
25   plaintiff's left side, which is not dominant, and audible, and palpable crepitus of the left knee.
26   (Tr. at 289.) Dr. Stanfield diagnosed plaintiff with a degenerative joint disease in both knees.

1    (Id.)  At a follow-up examination on September 20, 2001, plaintiff's knee examination was
2    unremarkable.  (Tr. at 285.)  Dr. Stanfield assessed that plaintiff's knee pain was most likely
3    degenerative, but a rheumatological disorder should be ruled out.  (Id.)  In October 2001, a
4    gallbladder and liver ultrasound study indicated that plaintiff had a history of mild, active
5    Hepatitis C, but the ultrasound was inconclusive for either polyps or gallstones.  (Tr. at 281,
6    303.)  On November 7, 2001, Dr. Stanfield diagnosed plaintiff with degenerative joint disease or
7    Hepatitis C related arthritis, Hepatitus C virus, abnormal ultrasound, polyps or gallstones and a
8    history of lactose intolerance.  (Tr. at 279.)

9            Plaintiff had a physical examination on January 15, 2002, which was essentially
10   normal, although she reported trouble sleeping.  (Tr. at 274.)  By February 2002, plaintiff was
11   being treated with medication due to diagnosis of degenerative joint disease and depression.  (Tr.
12   at 272.)  In March 2002, plaintiff's depression was noted as a flat effect, she had no movement
13   disorder, she had no tremors when her hands were outstretched, and, though she reported no side
14   effects from medication, she reported that medication provided no significant improvement in
15   her symptoms.  (Tr. at 270.)  On May 9, 2002, plaintiff reported that she felt slightly better.  (Tr.
16   at 267.)  Dr. Stanfield noted that medication controlled plaintiff's tremors.  (Id.)  Plaintiff
17   stopped taking her asthma medication on July 8, 2002, despite a report that she had a minimally
18   inflamed cough.  (Tr. at 259.)  Plaintiff was diagnosed with chronic obstructive pulmonary
19   disease and asthma.  (Tr. at 259.)  In July 2002, plaintiff had a slightly inflamed cough, but an x-
20   ray indicated that she had a history of asthma with no evidence of infiltrates or active
21   cardiopulmonary disease.  (Tr. at 300, 331.)  It was noted at that time that plaintiff's
22   antihistamine medication provided good relief of her symptoms.  (Tr. at 328.)  By October 2002,
23   it was noted that plaintiff had no side effects from her Hepatitis C treatment and had no
24   symptoms for anxiety or depression.  (Tr. at 326, 329.)

25           In February 2003, plaintiff re-started Hepatitis treatment after seventeen weeks of
26   therapy.  (Tr. at 321.)  Plaintiff had stopped earlier due to side effects.  (Id.)  It was noted that

plaintiff felt "good" and that her depression index was remaining constant. (Id.)  On March 25, 2003, laboratory tests confirmed a diagnosis of Hepatitis B and hyper-thyroid (Tr. at 318.)  By May, plaintiff's blood count showed a decreased number of white blood cells and a decrease in the number of blood platelets due to combination therapy for hepatitis. (Tr. at 315.)

Plaintiff was hospitalized for a near drowning incident from June 1, 2003 until June 25, 2003. (Tr. at 355-418.)  The Emergency room report reveals that bystanders told EMS that plaintiff was involved in an altercation with a man, and she was being hit and punched in the abdomen and was thrown into the river. (Tr. at 367.)  Plaintiff was very combative and had the odor of alcohol. (Tr. at 368.)  Drug screens were positive for alcohol, with a blood alcohol of 396. (Id.)   Thomas Andrews, M.D., a consultative psychiatrist, evaluated plaintiff on June 24, 2003. (Tr. at 359-361.)  Plaintiff related that she had been drinking a twelve pack of beer a day for the last two years, except from August of 2001 to November of 2001, and that she was homeless. (Tr. at 359.)  Plaintiff's mental status exam showed that plaintiff had a mild flat affect, no auditory hallucinations, but she reported that she had visual hallucinations at night and some racing thoughts and mood swings. (Tr. at 360.)  Plaintiff also stated that she had mood swings that could occur at multiple times during the day. (Id.)  On plaintiff's record, Dr. Andrews noted for Axis I: "[b]ipolar II, rule out schizoaffective; alcohol abuse....Axis IV: [m]anaging mood disorder and substance abuse."[3] (Tr. at 361.)  In his diagnosis, Dr. Andrews suggested an SSI application and recommended that plaintiff consider "drug and rehab at Shasta County Mental Health." (Tr. at 361.)  Dr. Andrews stated that he believed that plaintiff needed ongoing treatment and therapy. (Id.)  Dr. Andrews noted that plaintiff had a global assessment of functioning score (GAF) of 35, meaning that she had some impairment in reality testing or communication or a major impairment in several areas, such as work, school, family relations,

---

[3]Psychiatric diagnosis is divided into five parts, called Axis.  Axis I is the acute diagnosis, such as major depression.  Axis IV is stressors in the patient's life.  See http://expertpages.com/news/psychiatric_diagnosis.htm

1  judgment, thinking or mood. See Diagnostic and Statistical Manual of Mental Disorders (DSM)
2  32 (4th Ed. 1994).  Plaintiff was discharged from the hospital on June 25, 2003.  (Tr. at 355.)
3  Her discharge diagnosis included respiratory failure, resolved; strep pneumonia infection in the
4  lungs, resolved; pancytopenia (deficiency of all elements of the blood) due to alcoholic liver
5  disease; cirrhosis, hepatitis C, stable; bipolar disorder; and a history of alcoholism.  (Id.)  Upon
6  discharge, plaintiff was placed on an anti-depressant medication.  (Tr. at 311, 355.)  In August of
7  2003, Dr. Stanfield diagnosed plaintiff with bipolar disorder, hepatitis, alcohol abuse, tobacco
8  abuse and reactive airway disease. (Tr. at 308.)  Dr. Stanfield recommended that plaintiff attend
9  a drug and alcohol rehabilitation program.  (Id.)

10  In a written decision dated March 20, 2004 , the ALJ found that plaintiff had
11  some impairments, but found that her subjective pain complaints and functional limitations were
12  not fully credible.  (Tr. at 20.)  The ALJ found that plaintiff's impairments or a combination of
13  her impairments did not meet or equal the requirements of an impairment or combination of
14  impairments in the Listing of Impairments (Listing) in 20 C.F.R. Part 404, Subpart P, Appendix
15  1. (Tr. at 21.)  The ALJ found that plaintiff retained the residual functional capacity (RFC) to
16  engage in light work and had no environmental limitations on her ability to perform job related
17  activities. (Id.) Based on plaintiff's RFC and considering plaintiff's age, work experience and
18  education, the ALJ found that she was not disabled.  (Id.)  The decision of the ALJ became final
19  when the Appeals Council denied plaintiff's request for a review on June 8, 2004. (Tr. at 5-7.)
20  The plaintiff filed a timely appeal in this court on August 2, 2004.

**II.  STANDARD OF REVIEW**

22  This court's review is limited to whether the Commissioner's decision to deny
23  benefits to plaintiff is based on proper legal standards under 42 U.S.C. § 405(g) and supported
24  by substantial evidence on the record as a whole. See Copeland v. Bowen, 861 F.2d 536, 538
25  (9th Cir. 1988) (citing Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573,
26  575-76 (9th Cir. 1988)).  Substantial evidence means more than a mere scintilla of evidence, but

less than a preponderance, Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996) (citing Sorensen v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975)). "It means such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938)). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. See Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, see Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an improper legal standard was applied in weighing the evidence. See Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

**III.   DISCUSSION**

Plaintiff contends that the ALJ improperly evaluated plaintiff's mental and functional impairments. Specifically, plaintiff claims that there is not substantial evidence to support the ALJ's finding that plaintiff's mental impairments result in only mild functional restrictions. Step two of the five step evaluation[4] to determine eligibility for benefits serves to

---

[4] A five-step sequential evaluation governs eligibility for benefits. See 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past

9

screen out claimants with minor problems, making them ineligible for disability benefits. See Bowen, 482 U.S. at 146. A claimant's impairment, or combination of impairments, is not severe if it does not significantly limit his or her physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1521, 416. 921. When a claimant presents a colorable claim of mental impairment, the ALJ must fill out and attach, to the decision, a psychiatric review technique form (PRTF), evaluating the severity of the mental impairments. See Gutierrez v. Apfel, 199 F.3d 1048, 1051 (9th Cir. 2000). However, when a claimant does not present a viable mental impairment claim, the ALJ's failure to fill out a PRTF[5] does not constitute reversible error. Id.

The undersigned finds both that substantial evidence in the record supports the ALJ's finding that plaintiff's mental impairments were not severe and that the ALJ's failure to fill out a PRTF was harmless error because plaintiff did not present a viable claim of mental impairment. In his decision, the ALJ specifically noted that, prior to being seen by Dr. Andrews in June of 2003, plaintiff was never diagnosed with a mental impairment other than depression throughout her treatment history at her primary care facility, the Shasta Community Health Center (Health Center). (Tr. at 20.) Plaintiff's records from the Health Center indicate that she was treated for depression and anxiety symptoms. (Id.) The ALJ noted that any symptoms of

---

> work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. See Bowen, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

[5]Additionally, the undersigned notes that the Ninth Circuit has indicated that the evaluation form would not necessarily be material to a disability claim based predominantly on an ailment such as joint pain, even if claimant alleged a minor nonexertional ailment. Gutierrez, 199 F.3d at 1052. As plaintiff alleged that she was disabled based on joint pain as well as a bipolar disorder, the undersigned considers whether the PRTF form was necessary here.

hallucinations, mood swings and racing thoughts were absent from the record before and after plaintiff saw Dr. Andrews. (Id.) The ALJ noted that the evidence in the record showed that plaintiff's mental symptoms were not chronic. (Id.) Finally, the ALJ noted that Dr. Andrews based his assessment of plaintiff's mental disorders on plaintiff's own subjective complaints rather than objective criteria. (Id.)

The ALJ noted that the record did not support Dr. Andrew's assessed GAF score of thirty-five. Specifically, the ALJ remarked that the lack of Dr. Andrew's clinical findings, the lack of prior records supporting plaintiff having a GAF score of thirty-five and plaintiff's brief relapse with alcohol prior to the GAF exam resulted in the ALJ's decision to give little weight to Dr. Andrews's findings. (Tr. at 20.) The ALJ found that plaintiff's daily activities report and testimony did not support a finding that she had any significant restrictions in her daily activities such as lack of concentration and or social ability. (Tr. 20, 58-59, 114-15.) For instance, the record shows that plaintiff needed minimal assistance performing daily activities and that she had no difficulties getting along with relatives or friends. (Tr. 43-45, 114-15.) Although the record documented a rather severe altercation between plaintiff and her boyfriend, the ALJ concluded that this episode was related to plaintiff's recent relapse into alcohol abuse. (Tr. 20.)

The record contains substantial evidence to support the ALJ's evaluation of plaintiff's mental impairments. Although the record does include a medical record from September of 2003, which assesses plaintiff with "bipolar disorder," this record indicates that plaintiff's chief complaint was "depression" and does not support plaintiff's contention that she had a severe limitation due to mental impairments. (Tr. at 308.) On the whole, the record compels the conclusion that plaintiff's diagnosis of mental impairments and a GAF of thirty-five was largely based on subjective complaints and also that her diagnosis of severe mental impairment by Dr. Andrews fails to meet the Act's duration requirements. Accordingly the undersigned finds that the ALJ properly evaluated plaintiff's mental impairments and that the ALJ's failure to append a PRTF to his decision is harmless error. See Gutierrez, 199 F.3d at

11

1051.

Plaintiff next challenges the ALJ's finding that her allegations regarding her level of pain and functional limitations were not fully credible.  If the ALJ finds a claimant's testimony as to the severity of her pain and impairments unreliable, then the ALJ must make a specific credibility determination, with findings specific enough to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony.  See Thomas, 278 F.3d at 958-59.  In determining whether complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors.  See Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may also consider the following factors:  (1) the applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the applicant's daily activities.  See  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.

Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct also may be relevant. See Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  A failure to seek treatment for an allegedly debilitating medical problem may be a valid consideration by the ALJ in determining whether the alleged associated pain is not a significant nonexertional impairment. See Flaten v. Secretary of HHS, 44 F.3d 1453, 1464 (9th Cir. 1995).   The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177 n.6 (9th Cir. 1990).  "Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing." Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).  If the ALJ's credibility finding is supported by substantial evidence in the record, the court may not engage in

second guessing. See Morgan v. Comm'n of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999.)

   The ALJ's credibility determination is supported by substantial evidence in the record.  The ALJ considered the evidence in the medical records which described the onset, frequency and duration of plaintiff's depression. (Tr. at 17-22.)  The ALJ considered the factors which precipitated and aggravated plaintiff's depression. (Id.)  He observed that up to the beginning of 2002, the record was devoid of any diagnosed mental impairment or any alleged symptoms associated with an alleged mental impairment. (Tr. at 17, 272.)   The ALJ noted that, after plaintiff was diagnosed with depression and anxiety, she reported that an anti-depressant stabilized her symptoms.  See e.g., Sample v. Schweiker, 694 F.2d 639, 644 (9th Cir. 1982) (stating that proper inquiry is whether an impairment is amenable to control; claimant's impairment that was controlled by medication was not disabling).  Although plaintiff testified that she had visual hallucinations and mood swings, the ALJ noted that the objective findings in the record failed to document any mental problems that would substantiate plaintiff's claims. The ALJ noted that, instead, the record, both before and after June of 2003, was devoid of any symptoms of hallucinations or mood swings. He also noted that plaintiff's symptoms were consistently rated as mild, and she reported insomnia on only one occasion.  See Tonepetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (stating that the ALJ may properly consider medical evaluations which discredit subjective complaints).

   In making his credibility determination, the ALJ considered plaintiff's self-reported daily activities.  He found that plaintiff's testimony did not reveal any significant functional restrictions in her daily activities, social interactions, memory, concentration, pace or persistence secondary to a mental disorder. (Tr. at 20.)  The ALJ found that plaintiff required little or no assistance in daily activities and reported no problems in getting along with friends or relatives. (Id.)  The ALJ noted that plaintiff reported that she was able to watch television and work crossword puzzles, both of which undercut her contention that she is completely precluded

from working.  See Orteza v. Shahala, 50 F.3d 748, 750 (9th Cir. 1995).

        In evaluating plaintiff's credibility regarding plaintiff's complaints of knee pain, the ALJ found that the objective medical findings did not support the degree of limitation alleged by plaintiff.  See Bunnell, 947 F.2d at 344.  Both treating source and consultative records revealed mild to moderate objective findings and indicated no soft tissue abnormalities associated with plaintiff's knees.  (Tr. at 198, 285.)  Examination of plaintiff's knees in June of 2001 revealed that plaintiff had swelling in her knees, effusion and heat and limited motion of both knees.  (Tr. at 17, 191-195.)  However, no evidence of spasm, deformity or problems in plaintiff's hands, feet or lower extremities were noted.  (Id.)  The ALJ noted that, in light of these modest findings and the effectiveness of plaintiff's medications in combating her knee pain, plaintiff's pain was not severely limiting.  (Tr. at 18, 274-279.)  The ALJ further noted that plaintiff never complained to her treating physicians that she had an inability to perform sustained walking or standing due to knee pain.  (Tr. at 16.)  Accordingly, the undersigned finds that there is substantial support in the record for the ALJ's findings that plaintiff's complaints of mental impairment and pain were only partially credible.

        Plaintiff next challenges the ALJ's determination that plaintiff retained the RFC for a wide range of light, unskilled work.  (Tr. at 19, 21, 22.)  The ALJ is solely responsible for assessing a claimant's RFC and for resolving conflicts in the evidence.  See Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).   Here, the ALJ found that plaintiff had a RFC to lift or carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours, occasionally kneel, crouch, crawl and squat, and she is limited to unskilled work.  (Tr. at 22.)

        In coming to this conclusion, the ALJ considered plaintiff's treating records as well as Dr. Miller's and the Disability Determination Service physician's assessments that plaintiff remained capable of performing light work.  (Tr. at 19.)  The ALJ noted that, while there was evidence of bilateral knee arthritis in plaintiffs' records, there was nothing to indicate that this condition was of the severity that would preclude all work.  (Id.)  The ALJ also noted

that there were times when plaintiff did not need to take her pain medication and concluded that this further supported a finding that she could engage in light work. (Id.) In assessing plaintiff's mental impairments, the ALJ noted that plaintiff had significantly reduced her abuse of drugs and alcohol since August 2001 and that this disorder does not restrict her ability to work. (Id.) He noted that the medical records reflect that, although plaintiff was diagnosed and treated for depression and anxiety, she never reported to a treating source symptoms of hallucinations or mood swings. (Id.) Accordingly, the undersigned finds that the ALJ's resolution of conflicting evidence and his assessment of plaintiff's RFC is supported by substantial evidence in the record.

Plaintiff's next argument is that the ALJ erred in failing to further develop the record. The ALJ has a duty to develop the record in social security cases. See 20 C.F.R. § 416.912(e); Maynes v. Massanari, 276 F.3d 453, 459-460 (9th Cir. 2001). However, this duty is only triggered when the record does not present sufficient evidence to allow the ALJ to make a decision. See Maynes, 276 F.3d at 459-60. Sufficient evidence is evidence such that a reasonable mind might support as adequate to support a conclusion. See id.

Plaintiff's contention that the ALJ's decision was not supported by substantial evidence is based on the ALJ's failure to question plaintiff about when her alleged mood swings began or when she began treatment for depression. Plaintiff contends that the ALJ should have queried her about what effect, if any, her depression and bipolar disorder had on her functional capacity to work or on her ability to perform activities of daily living and social functioning. Specifically, plaintiff states that the ALJ never obtained clarification either from Dr. Andrews concerning his evaluation that plaintiff had a bipolar disorder or from Dr. Krahling about his statement on plaintiff's discharge from Mercy Medical Center that she had impulsive behavior.

To require such action would shift plaintiff's own burden to the ALJ. It was plaintiff's duty to establish that she was disabled. See 42 U.S.C. § 423(d)(5). The ALJ's duty to develop the record is triggered only when the evidence is ambiguous or inadequate to allow for

proper evaluation. See Tonapetyan, 242 F.3d at 1150. Neither is the case here. Instead, in the present case, Dr. Andrew's opinion was in conflict with the other medical evidence in the record, which did not indicate that plaintiff suffered from a severe mental impairment. The undersigned finds that the ALJ properly resolved the conflict in the evidence by relying on the substantial evidence in the record which indicates that plaintiff did not suffer from a severe mental impairment. See Maynes, 276 F.3d at 459-60.

Plaintiff's final challenge is that the ALJ erred by relying solely on the medical-vocational guidelines (GRIDS) to find that plaintiff was not disabled. The Medical-Vocational Guidelines ("the grids") are in table form. The tables present various combinations of factors the ALJ must consider in determining whether other work is available. See generally Desrosiers, 846 F.2d at 577-78 (Pregerson, J., concurring). The factors include residual functional capacity, age, education, and work experience. For each combination, the grids direct a finding of either "disabled" or "not disabled."

There are limits on using the grids, which are an administrative tool to resolve individual claims that fall into standardized patterns: "[T]he ALJ may apply [the grids] in lieu of taking the testimony of a vocational expert only when the grids accurately and completely describe the claimant's abilities and limitations." Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5, 103 S. Ct. 1952, 1955 n.5 (1983). The ALJ may rely on the grids, however, even when a claimant has combined exertional and nonexertional limitations, if nonexertional limitations are not so significant as to impact the claimant's exertional capabilities.[6] See Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990),

---

[6] Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling. 20 C.F.R. § 416.969a (b) (2003); SSR 83-10, Glossary; compare Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).
Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (2003); SSR 83-10, Glossary; Cooper, 880 F.2d at 1155 & n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)). "If a claimant has an impairment that limits his or her ability

overruled on other grounds,; Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988); see also Odle v. Heckler, 707 F.2d 439 (9th Cir. 1983) (requiring significant limitation on exertional capabilities in order to depart from the grids).

Here, the evidence in the record supports the ALJ's finding that plaintiff had failed to establish that her alleged symptoms of mood swings and visual hallucinations happened on a chronic basis or that plaintiff had bipolar disorder. As previously noted, plaintiff mentioned her mood swings and hallucinations in one visit with Dr. Andrews. Her treating source records make no mention of such symptoms. Further, plaintiff was consistently treated for depression and seen for a chief complaint of depression and was never treated or seen for bipolar disorder. The records supports the ALJ's conclusion that plaintiff had failed to establish a significant nonexertional limitation. Accordingly, the ALJ was correct in applying the GRIDS to determine plaintiff's RFC.

## IV.    CONCLUSION

The ALJ's decision is fully supported by substantial evidence in the record and based on the proper legal standards. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment or remand is denied, and

2. The Commissioner's cross motion for summary judgment is granted.

DATED: September 27, 2005.

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE

---

to work without directly affecting his or her strength, the claimant is said to have nonexertional (not strength-related) limitations that are not covered by the grids." Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., pt. 404, subpt. P, app. 2 § 200.00(d), (e).

17